**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PHILIP A. SELTZER,
           *Plaintiff-Appellant,*

v.

PAUL REVERE LIFE INSURANCE
COMPANY; UNUM GROUP, FKA
UnumProvident Corporation,
           *Defendants-Appellees.*

No. 11-15046

D.C. No. 2:09-cv-
02104-SRB
District of Arizona,
Phoenix

ORDER
CERTIFYING A
QUESTION TO
THE SUPREME
COURT OF
ARIZONA

Filed July 18, 2012

Before: Stephen Reinhardt, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

---

## COUNSEL

Steven C. Dawson (argued), Anita Rosenthal, and Steven A.
Gruenemeir, Dawson & Rosenthal P.C., Phoenix, Arizona, for
the appellant.

Stephen M. Bressler, Ann Martha Andrews, Kristina N. Hol-
mstrom, Lawrence Kasten (argued), Lewis and Roca LLP,
Phoenix, Arizona, for the appellee.

---

## ORDER

Plaintiff Philip Seltzer has asserted contract and bad faith claims against Defendant Paul Revere Life Insurance Company and Unum Group, Paul Revere's parent company.[1] This appeal presents the question of when the claims accrued for the purpose of determining whether those claims are barred by Arizona's statute of limitations.

As described in more detail below, Seltzer became disabled in 1981 and was unable to continue his career as a chiropractor. He was paid monthly disability benefits by Paul Revere starting that year. Under the policies, those payments would continue for the rest of Seltzer's life if the disability was the result of an "accident," but would cease when Seltzer turned 65 if it was the result of "sickness." Seltzer initially reported the disability as a "sickness," and Paul Revere classified it that way. Seltzer later revised the description to characterize it as the result of an "accident." After meeting with a Paul Revere employee in 1986, Seltzer signed a statement at Paul Revere's request that "I agree to the understanding of this as a sickness claim and not an accident." Some years later, Seltzer again took the position that the disability resulted from an "accident," but Paul Revere did not change its position and stopped paying benefits when Seltzer turned 65 in 2009.

Seltzer argues that his claims did not accrue until 2009, when Seltzer turned 65 and Paul Revere stopped paying benefits. Paul Revere argues that Seltzer's claims accrued no later than 1986, when Seltzer agreed to the classification of his claim as resulting from "sickness."

---

[1] Paul Revere was acquired by Provident in 1997. Provident merged with Unum in 1999 and did business under the name "UnumProvident" for several years before re-naming itself "Unum." The correspondence in the record reflects these changes of ownership and name, but for the sake of clarity we refer to Seltzer's insurer as "Paul Revere" throughout this Order.

Because this issue is governed by Arizona law but is not clearly addressed by relevant Arizona authorities, we certify it to the Supreme Court of Arizona pursuant to the procedures established by Arizona Revised Statues § 12-1861 and Rule 27 of the Rules of the Supreme Court of Arizona.

## I.   Factual Background

Pursuant to Supreme Court of Arizona Rule 27(a)(3)(B), we set forth the facts relevant to the question certified.

In 1981, at the age of 36, Seltzer's wrist pain forced him to cease his practice as a chiropractor. ER 204.[2] Seltzer was covered by two disability insurance policies issued by Paul Revere. ER 3. Both policies provided monthly payments in the event of the insured's disability. If the disability was due to "accident," the policies provided for benefits for the rest of Seltzer's life. If the disability was due to "sickness," the policies provided for benefits only until the insured's 65th birthday. ER 146, 158.

Seltzer submitted a disability claim to Paul Revere. He used the claim form for a disability caused by "sickness." ER 4. The physicians' records and letters he submitted in support of his claim described his disability as a progressive condition from chronic trauma related to his occupation and did not trace the condition to any specific accident, though one doctor did use the word "injury." ER 33-34, 137, 204. In response to a request for clarification from Paul Revere, Seltzer's treating physician said that "[a]s far as the date of his injury, I feel this was probably a slowly progressive thing which came on from chronic trauma related to his occupation." An orthopedic surgeon agreed, opining that "it is my belief that [Seltzer] had an occupational overuse syndrome." ER 134.

---

[2] "ER" references are to the excerpts of record filed by Seltzer in this Court for the purposes of this appeal.

Paul Revere began paying benefits without specifying whether it considered Seltzer's disability to be due to sickness or accident. Each month, Seltzer submitted a monthly progress report to the insurer which gave him a choice between checking a box for "sickness" or for "accident." From 1981 through early 1984, Seltzer checked the "sickness" box. ER 4.

In February 1984 an orthopedic surgeon reported to Paul Revere that Seltzer told him that Seltzer's wrist pain had first appeared when "he was manipulating a very large patient who was very muscular" and "felt something snap very sharply in both of his wrists." ER 201. Seltzer said he was rushed to the hospital immediately after the incident. *Id.*[3] Paul Revere was apparently unsure how to respond to the new report. Its medical department noted that the "history of sudden onset" described in the new report was an example of the "discrepancies" in Seltzer's accounts of his injury. ER 250, 260. In May 1984 Seltzer began checking the "accident" box instead of the "sickness" box on his monthly forms. ER 4.

In April 1986 Paul Revere dispatched its employee Sandra Imboden to speak to Seltzer about the classification of his disability. ER 4. After their meeting, at Imboden's request, Seltzer signed a handwritten, notarized note which read in its entirety:

> I have discussed today with Sandra Imboden the
> sickness status of this claim as filed by me in April
> 1981 and confirmed by letter from Dr. Herbertson.

---

[3]The record contains inconsistent references to the date of this incident. Dr. Ditkoff described the incident as occurring on March 27, 1981, the date of Seltzer's first visit to Dr. Herbertson. ER 201-04. Seltzer himself did the same in subsequent communications with Paul Revere. ER 112, 125, 127. Seltzer now says that this was a mistake, and that the incident in fact occurred on April 21, 1981, the date of his second visit to Dr. Herbertson. ER 137.

> I agree to the understanding of this as a sickness claim and not an accident.

ER 214. Imboden reported to the insurance company that Seltzer "understands that sickness and accident pay different benefit periods." ER 247. She said that "I will allow you to use your judgment as to whether a follow-up letter need be sent." ER 92. Paul Revere never sent a follow-up letter. Seltzer returned to his previous custom of checking the "sickness" box on his monthly forms.

In 1994, Seltzer met with a representative of Paul Revere to discuss the possibility of Seltzer's surrendering future payments under the policy in exchange for a lump-sum payment of $403,000. ER 5. The Paul Revere employee said that in the course of discussing his calculations, he noted that Seltzer was only eligible for benefits until the age of 65. ER 5. Seltzer apparently did not object to this assumption. No changes resulted from the discussion, and the monthly payments continued. ER 5.

Subsequent doctor visits over the years produced evidence that Seltzer contends supports his "accident" theory. In 1991, based on an MRI of Seltzer's wrists, a radiologist diagnosed a "rupture of the triangular fibrocartilage of the right wrist," which he classified as an "injury." ER 262. In 1999, one of Seltzer's doctors wrote Paul Revere a letter explaining that Seltzer "apparently had a significant episode on March 21, 1981, after manipulating an extremely muscular patient" and that "[h]is condition is not known to be related to a systemic illness." ER 112.

That same year, Seltzer switched back to checking the "accident" box on his forms. ER 4. *See, e.g.,* ER 113. Paul Revere apparently did not take any action in response.

In January of 2009, just nine months shy of his 65th birthday, Seltzer sent Paul Revere a letter asking it to confirm that

it classified his disability as resulting from an accident. ER 4, 125, 127, 130. A Paul Revere employee informed Seltzer over the phone that "at this point in time, his claim is being handled under the Sickness provision of his policy." ER 130. Paul Revere followed up this phone conversation with a letter that summarized its reasons for classifying Seltzer's disability as due to sickness, including the medical evidence from Seltzer's doctors and Seltzer's 1986 statement. ER 134-35.

At Paul Revere's invitation, Seltzer appealed from the determination reported in the letter. ER 135-39. Pursuant to its internal appeals process, Paul Revere's "in-house physician" spoke with Seltzer's attending physician and reviewed the records related to Seltzer's claim. ER 137. The in-house physician concluded that "the etiology [of Seltzer's disability] is an overuse syndrome, which aggravated a preexisting degenerative state of the triangular fibrocartilage or a slight anatomical anomaly in the ulnar aspect of the wrist area." ER 138. Consistent with this opinion and its earlier analysis of the claim file, Paul Revere upheld its determination that Seltzer's disability was due to sickness. *Id.*

Plaintiff sued the insurer for breach of contract and insurance bad faith in state court. ER 4. The insurer removed the action to the U.S. District Court for the District of Arizona. ER 4. The district court concluded that Seltzer's claims were barred by the statute of limitations and granted summary judgment in favor of Paul Revere. ER 9. Seltzer appealed to this court. In a memorandum disposition filed concurrently with this certification order, we affirmed that summary judgment in part. Specifically, we concluded that Seltzer failed to include in his complaint any allegations in support of his alternative theory that he is entitled to lifetime benefits under a policy provision unrelated to the "accident" provision discussed in this certification order, and that he also failed to seek leave from the district court to add any such allegations.

## II.   The Question of Law

This case turns on an issue of state law: when did Seltzer's contract and bad faith claims accrue? Did the claims accrue no later than 1986, when Seltzer signed a statement agreeing to the "understanding" that his disability was caused by sickness? Or did they accrue only in 2009, when the insurance company reiterated its position that the disability resulted from sickness and ceased making payments? If the claims accrued in 1986, Seltzer's claims are barred by the relevant statutes of limitations. Ariz. Rev. Stat. §§ 12-542; 12-548; *Ness v. W. Sec. Life Ins. Co.*, 851 P.2d 122, 125 (Ariz. Ct. App. 1992). If they accrued in 2009, they are not.

The Arizona cases which have been identified do not allow us to reliably determine how the Supreme Court of Arizona would answer this question. Seltzer relies primarily on *Ness*. In that case the insurer stopped payment to the plaintiff in 1985 because it determined that he was not totally disabled from any occupation. *Id.* at 124. In its communications with Ness over the next two years, however, the insurer said that Ness's right to continuing benefits "rests upon a determination of what jobs, if any, [Ness] may be reasonably qualified for," and that the insurer "would be pleased to receive an update of the medical treatment Ness has received since June 24, 1985." *Id.* at 126. It was not until 1987 that the insurer "finally and unequivocally denied" Ness's claim. *Id.* at 125. The Arizona Court of Appeals reasoned that the insurer's pre-1987 communications did not necessarily amount to an "unequivocal written denial of the claim," but may have "held out some hope to Ness that additional benefits might be paid." *Id.* at 125-126. It therefore concluded that there was a genuine issue of material fact as to when the statute of limitations began to run. *Id.* at 126.

*Ness* supports the proposition that a claim accrues only upon the insurer's "unequivocal written denial of the claim," *id.* at 125, but it does not tell us whether or not Paul Revere's

communications with Seltzer fit that description. In *Ness*, the insurer's pre-1987 communications implied that it had yet to make a determination on the dispositive issue, or, at the very least, that it might be persuaded to reverse the determination that it had made. *Id.* at 125-26. It is not clear that any of Paul Revere's post-1986 communications with Seltzer did the same. Moreover, Ness continued to dispute the denial of his claim during the two-year period in question. *See id.* at 124. Seltzer, by contrast, affirmatively repudiated his "accident" theory in 1986 and made no further attempt to challenge Paul Revere's "sickness" classification until 1999, at the earliest. One possibility implied, but not expressly held, by *Ness* is that the question of whether Paul Reverse's communications with Seltzer fit the description of an "unequivocal denial of the claim" should be resolved by a jury.

Nor do the parties' citations to a line of cases arising from the malpractice and litigation context answer our question. In *DeBoer v. Brown*, 673 P.2d 912, 914-15 (Ariz. 1983), the Supreme Court of Arizona held that a medical malpractice cause of action accrues when the patient suffers harm, not when the doctor commits malpractice. In *Amfac Distribution Corp. v. Miller*, 673 P.2d 792, 793-94 (Ariz. 1983), this rule was extended to the legal malpractice context. *Amfac* held that a litigant's cause of action against his or her attorney does not accrue when the malpractice occurs or when the litigant discovers it, but when the litigant's damages become "irrevocable" upon the finalization of appeal from the case. *Id.* In *Taylor v. State Farm Mutual Auto Insurance Co.*, 913 P.2d 1092, 1096-97 (Ariz. 1996), the Supreme Court of Arizona applied its reasoning from the malpractice cases to a third-party bad faith claim, holding that the plaintiff's claim against his liability insurer did not accrue until appeal from the underlying action was final.

The rule developed in these cases, however, is not easily generalizable to the present case. The decisions are based on the insight that even when a prospective plaintiff discovers a

doctor, lawyer, or liability insurer's error, he or she may not know whether and to what extent he or she has been irreversibly harmed, and thus may not be in a good position to decide whether to litigate. *See DeBoer*, 673 P.2d at 914; *Amfac*, 673 P.2d at 793; *Taylor*, 913 P.2d at 1096. First-party insurance cases may be different. The insurance company's decision to deny benefits may itself be a relevant harm. *Cf. Rawlings v. Apodaca,* 726 P.2d 565, 579 (Ariz. 1986) (insurance contracts protect the "peace of mind" of the insured). The insurer's subsequent non-payment of the denied claim is a second and separate event, arguably less akin to finalization of appeal from the judgments in *Amfac* and *Taylor* than to payment of those judgments. We are aware of no Arizona case that suggests a malpractice plaintiff or third-party insured must pay the judgment in the underlying action before suing his or her attorney, for example.

The parties also call our attention to the rationales the Arizona courts have given for their interpretation of Arizona's statutes of limitations, but the policy arguments may cut both ways. On the one hand, it has been recognized that "loss of evidence from death of some witnesses, and the imperfect recollection of others, or the destruction of documents" can make it "impossible to establish the truth" of a "stale claim[ ]." *Mayer v. Good Samaritan Hosp.*, 482 P.2d 497, 500 (Ariz. Ct. App. 1971) (quoting *Riddlesbarger v. Hartford Ins. Co.*, 74 U.S. 386, 390 (1869)). On the other hand, concern has been expressed that constructing statutes of limitations in a way that forces parties into court too soon may "result in precautionary and duplicitous litigation—a waste of both the courts' and the parties' time and resources." *Taylor*, 913 P.2d at 1096-97; *see also Glaze v. Larsen*, 83 P.3d 26, 30 (Ariz. 2004). Both of these concerns are particularly acute in this case. Allowing a lawsuit thirty years after Seltzer became disabled presents the specter of deceased or superannuated witnesses and empty memories. Indeed, some of the depositions illustrate that. ER 221-22. On the other hand, interpreting the statute of limitations to bar such a lawsuit would require an

insured in Seltzer's position to litigate a classification that will make no practical difference for many years, and, if the insured recovers or passes away, might never make any difference. And, to the extent that the collection of long-term data on the insured's disability or advances in medical technology contribute to the parties' understanding of the insured's claim, early litigation may deprive the court of more evidence than late litigation.

The trade-offs between these policy considerations and the interpretation of Arizona's statutes are better entrusted to the Supreme Court of Arizona than to us. We therefore certify the following question of law: under the facts described in this order, when did Seltzer's claim for lifetime benefits accrue?

The clerk of this court shall forward the original and six certified copies of this order, under official seal, to the Arizona Supreme Court, along with copies of all briefs and excerpts of record that have been filed with this court, as directed by Supreme Court of Arizona Rule 27.

### III.   Counsel

For Plaintiff-Appellant Philip Seltzer: Steven C. Dawson, Anita Rosenthal, and Steven A. Gruenemeir, Dawson & Rosenthal P.C., 1850 North Central Avenue, Suite 510, Phoenix, Arizona, Telephone (602) 494-3800.

For Defendants-Appellees Paul Revere Life Insurance Company and Unum Group, FKA UnumProvident Corporation: Stephen M. Bressler, Ann Martha Andrews, Kristina N. Holmstrom, Lawrence Kasten, Lewis and Roca LLP, 40 North Central Avenue, Suite 1900, Phoenix, Arizona 85004-4429, Telephone (602) 262-5311.

### IV.   Filing fee

The parties shall equally share the required filing fees pursuant to Supreme Court of Arizona Rule 27(a)(3)(D).

## V. Stay of Proceedings

In light of our decision to certify the issue described here, all further proceedings in this case before our court are stayed pending final action by the Supreme Court of Arizona, save for any petition for rehearing regarding the memorandum disposition filed concurrently with this order. The parties shall notify the Clerk of this court after the Supreme Court of Arizona accepts or rejects certification, and again within fourteen days if the Supreme Court of Arizona issues a decision.

**QUESTION CERTIFIED; PROCEEDINGS STAYED.**

It is so **ORDERED.**

_____

Stephen Reinhardt, Presiding Judge